**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

   ANUDEEP MEKA,

                                **Plaintiff,**

       -against

   DELOITTE LLP and DELOITTE CONSULTING LLP,

                            **Defendants.**
------------------------------------------------------------------------X

**Civil Action No:**

**VERIFIED**
**COMPLAINT**

     Plaintiff, by the Law Office of Alexander Paykin, P.C., his attorneys, complaining of Defendants respectfully allege as follows:

## PARTIES

     1.    Plaintiff **ANUDEEP MEKA** ("Plaintiff" or "Mr. Meka") is a natural person and a resident of the State of Texas.

     2.    Defendant **DELOITTE LLP** ("Deloitte") is a limited liability partnership organized under the laws of the State of New York, with its principal place of business at 30 Rockefeller Plaza, 41st Floor, New York, NY 10112. Deloitte is the parent company of Deloitte Consulting LLP.

     3.    Defendant **DELOITTE CONSULTING LLP** ("Deloitte Consulting") is a limited liability partnership organized under the laws of the State of Texas, with its national office and principal place of business at 30 Rockefeller Plaza, 41st Floor, New York, NY 10112, as explicitly stated in its official employment documentation. Deloitte Consulting is a subsidiary of Deloitte, operates as a professional services firm, and is a major federal contractor subject to H-1B regulations and FCRA compliance. While Deloitte Consulting maintains offices throughout the United States, including in Dallas, Texas, its "nerve center" where high-level decisions are made and from which the partnership is ultimately controlled is located in New York, as indicated in

Mr. Meka's offer letter and employment agreement.

4.       Defendants Deloitte and Deloitte Consulting are collectively referred to herein as "Defendants."

## JURISDICTION & VENUE

5.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because the claims arise under federal laws, including the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.) and H-1B regulations (8 C.F.R. § 214.2[h] and 20 C.F.R. § 655.731). Jurisdiction is proper in this Court regardless of the citizenship of the parties.

6.       Venue is proper in this district under 28 U.S.C. § 1391(b) because: (1) Defendants maintain their principal places of business in this district; (2) a substantial part of the events or omissions giving rise to the claims occurred in this district; and (3) the employment agreement at issue explicitly states, "This Agreement is deemed to have been executed in the Employer's national office in New York, New York and will be construed and governed in accordance with the laws of the State of New York, without regard to its conflicts-of-law principles," thus establishing a significant connection to this district despite the work location being in Dallas, Texas.

## THE UNDERLYING FACTS

7.       Defendants exploited the H-1B visa system by recruiting Mr. Meka internationally, sponsoring his visa, then wrongfully rescinding his employment using pretextual concerns despite prior clearance. Defendants failed to meet their legal obligations regarding wages, documentation, and proper notification, causing significant harm to Mr. Meka while demonstrating willful disregard for regulations protecting foreign workers.

### A.  Employment Offer and Background Check Process

8.      On June 28, 2024, Mr. Meka resigned from his position at IBM.

9.      On August 21, 2024, Deloitte Consulting extended an offer to Mr. Meka for the position of Senior Consultant in the Enterprise Performance group, based in their Dallas office, with an annual salary of $160,000, a $5,000 signup bonus, and benefits including health insurance. The offer letter was prepared on Deloitte Consulting LLP letterhead but prominently displayed the New York headquarters address (30 Rockefeler Plaza, 41st Floor, New York, NY 10112-0015) and was signed by Dan Helfrich, Chair & CEO of Deloitte Consulting.

10.     Deloitte Consulting agreed to sponsor Mr. Meka's H-1B visa. Mr. Meka accepted the offer on the same day and submitted the Background Investigation Questionnaire (BIQ) form as part of Defendants' onboarding process.

11.     Following the submission of the BIQ form on August 21, 2024, Defendants completed a background investigation. Upon completion of this background check, Deloitte Consulting proceeded to sponsor Mr. Meka's H-1B visa. The U.S. Consulate in India issued the visa, and Mr. Meka entered the U.S. on December 26, 2024, under Deloitte Consulting's H-1B sponsorship.

12.     Mr. Meka was required to list IBM as his "Current Employer" on the BIQ form despite his employment with IBM ending on June 28, 2024, due to a system constraint in Defendants' background check system.

13.     The BIQ Submission Report (signed August 21, 2024) explicitly states: "*Do not leave gaps greater than 2 months: You will not be able to submit the BI form if there are gaps between employers greater than 2 months... No gaps are permitted between your last employer and the current date*." Since Mr. Meka's IBM employment ended June 28, 2024, creating a 54-day

gap until August 21, the system's field validation required listing IBM as "Current Employer" to allow submission. The system rejected attempts to mark this period as "Not Employed," effectively forcing the "Current" designation.[1]

14.     On August 22, 2024, Mr. Meka explicitly informed Matt Whittle at Deloitte Consulting via email: "I am traveling out of the United States on Monday 26th August as it would be the 59th day after I am done with my employment with IBM." Mr. Whittle acknowledged this information on August 29, 2024, and later confirmed in his January 17, 2025 email: "As far as end date with IBM Anudeep fully informed me that he rolled off 6/28 (I noted the date in my interview notes)."

15.     On September 17, 2024, Berry Appleman & Leiden LLP ("BAL"), Defendants' immigration counsel, confirmed receipt of Mr. Meka's H-1B questionnaire and stated: "We will proceed with preparing the H-1B on your behalf," confirming they knew his post-IBM status before filing his petition.

**B. H-1B Visa Entry and Subsequent Background Check Issues**

16.     Prior to Mr. Meka's entry into the U.S., Defendants sent him a background check form specifically for a criminal background refresh, as evidenced by a December 3, 2024, email from Hilary Hamilton at Deloitte Consulting stating it was "just a criminal refresh, and not a full background investigation," indicating that the initial background check, including employment verification, had already been completed satisfactorily.

17.     Mr. Meka entered the United States on December 26, 2024, under Deloitte

---

[1] This systemic flaw is evidenced by Deloitte's instructions, which state: "No gaps are permitted between your last employer and the current date. If there is such a gap, please mark this period as 'Not Employed,'" yet the system rejected such entries, forcing the 'current' designation. This issue persisted during the December 9, 2024, BIQ criminal refresh requested by Senior Preboarding Specialist Hilary Hamilton, where the same validation error required listing IBM as 'current' despite Deloitte's full awareness of his employment status.

Consulting's H-1B sponsorship. At this point, Defendants became legally obligated to either employ Mr. Meka and pay him the wage specified in the Labor Condition Application or to effect a bona fide termination by providing notice to both Mr. Meka and U.S. Citizenship and Immigration Services (USCIS).

18.     Despite the completed background check and Mr. Meka's entry into the U.S., on January 3, 2025, at 11:08 AM, Cindy from Deloitte Consulting emailed Mr. Meka, stating, "The Security Review Team has informed us that they reached out to you this morning with an email via the Inquire System due to a new flag on your Present Employment Verification... The Security Review Team is requesting IRS transcripts to verify your employment..." Mr. Meka responded at 11:57 AM, providing all requested transcripts. At 1:39 PM, Cindy replied, "The Security Review Team has indicated they are currently reviewing the documents you provided... If additional time is needed, your start date would be adjusted to Monday, 1/13/25."

19.     On January 8, 2025, at 3:51 PM, Cindy emailed Mr. Meka, stating, "I am following up via email as we will unfortunately have to delay your start date tentatively to Tuesday, 1/21/25... as an internal Deloitte committee will need to further review the matter brought to your attention by the Inquire System." On the same day, Mr. Meka provided additional documents. At 4:05 PM, Cindy replied, "I have forwarded the information provided to the Security Review Team for their review."

20.     On January 9, 2025, at 6:00 AM, Mr. Meka emailed Defendants, providing IBM's employment verification letter to PreboardingBI@deloitte.com, confirming his exit on June 28, 2024, following Defendants' request.

**C. Disclosure of Prior Employment and Subsequent Verification**

21.     On January 17, 2025, the First Advantage background check company requested

the same verification letter (Support Case Number: 09165612), and Mr. Meka promptly responded at 12:50 PM to client.services@fadv.com with the verification letter. He also clarified in his January 17, 2025 email to Heather Hickox that IBM did not provide the verification letter until January 9, 2025, necessitating initial reliance on IRS transcripts and paystubs, which he had provided.

22.     Upon a specific request from Heather Hickox on January 17, 2025, Mr. Meka disclosed a prior part-time role with NIC Info Tek (from July 25, 2022, to August 25, 2024) that had been completed before his entry to the U.S. under Deloitte Consulting's H-1B sponsorship.

23.     Per the offer letter's terms, disclosure of part-time roles was only required during onboarding if the role was still ongoing, meaning this completed role did not need to be disclosed during either preboarding or onboarding. This part-time position was under a concurrent H-1B visa and had ended on August 25, 2024, four months before Mr. Meka entered the US under Deloitte Consulting's sponsorship.

24.     In the BIQ Submission Report (page 20), Mr. Meka correctly listed NIC Info Tek as a "Former Employer" with a start date of April 2012 and end date of October 2021, accurately reflecting the conclusion of his full-time employment on October 10, 2021. This information was subsequently verified by First Advantage, as Mr. Meka confirmed in his January 17, 2025, email to Heather Hickox: "First Advantage reached out to NIC Info Tek and verified my employment since 2012."

**D. Completed Background Check and Onboarding Activities**

25.     On January 22, 2025, Heather Hickox from Deloitte Consulting emailed Mr. Meka, stating, "Your background investigation is still in process... We are waiting for the verification of employment to be completed... Once we receive the results, we will reach out with an update." On

the same day, at 6:31 AM, the Office of Security confirmed Mr. Meka's badge was ready for pickup at the Dallas office.

26.    On January 23, 2025, at 7:09 PM, First Advantage confirmed the successful completion of Mr. Meka's background check (Order ID: 305241262) in an email to Mr. Meka, Heather Hickox, Matt Whittle, and PreboardingBI@deloitte.com, stating the order was "closed and completed" with an "eligible" score.

27.    Following the successful background check clearance, Defendants proceeded with onboarding activities, including:

    (a) January 22, 2025: Office of Security confirmed Mr. Meka's badge was ready for pickup at the Dallas office.

    (b) January 24, 2025: Defendants' Laptop Team promised a new laptop for his new start date.

    (c) January 27, 2025: Defendants sent a Dlaunch invitation for an orientation session scheduled for February 3–4, 2025, in Chicago, instructing him to bring his Deloitte laptop—which had not yet been delivered.

### E.  Improper Rescission and Failure to Meet H-1B Obligations

28.    Despite these communications and the completed background check, on January 30, 2025, Defendants rescinded the offer without providing formal written notice.

29.    The rescission cited baseless reasons, including alleged failure to provide prior employer verification and non-disclosure of the completed part-time role, despite Mr. Meka's demonstrated compliance, the prior completion of the background check on August 21, 2024, the re-background check conducted based on the transcripts and employment verification letter he

provided, and the fact that disclosure of the completed part-time role was not required per Defendants' own policy.

30.    Mr. Meka visited the Dallas office on January 30, 2025, where security took his badge and corporate credit card and escorted him out, providing no formal termination documentation.

31.    Defendants failed to fulfill their obligations under H-1B regulations in multiple ways:

(a)  Failed to pay Mr. Meka wages as required by 20 C.F.R. § 655.731;

(b)  Failed to complete Form I-9 as required by 8 C.F.R. § 274a.2;

(c)  Failed to provide paystubs necessary for H-1B visa transfer; and

(d)  Failed to notify U.S. Citizenship and Immigration Services (USCIS) of the rescission, as required for a bona fide termination under 20 C.F.R. § 655.731(c)(7)(ii).

32.    The lack of paystubs, a direct result of Defendants' failure to comply with H-1B regulations, prevented Mr. Meka from transferring his H-1B visa to a new employer, stalling his transfer effort initiated on March 14, 2025, and hindering job applications, as paystubs are typically required to verify lawful status. This caused significant professional harm, as potential employers questioned his employment history, further damaging his reputation.

33.    Additionally, Defendants' failure to provide wages and benefits as promised in the offer letter, including health insurance, left Mr. Meka without a Qualified Health Plan for the past 69 days as of April 28, 2025, making him ineligible for a Special Enrollment Period through the Marketplace. Consequently, he could only qualify for a Guaranteed Issued plan that does not cover pre-existing conditions, causing significant personal harm due to the lack of adequate medical

coverage.

### F.  Defendants' Exploitation of H-1B Status and Bad Faith Actions

34.     On March 19, 2025, at 5:14 PM, Defendants, through Leah Prince, emailed Mr. Meka, stating, "We are in receipt of your email dated March 2, 2025, where you reference the complaint filed with the U.S. Department of Labor (DOL). We reached out to the Murthy Law Firm who confirmed that they do not represent you in this matter, so we are contacting you directly... Deloitte is willing to offer you return transportation home... The offer of return transportation is for a departure from the U.S. no more than 90 days from your receipt of this email. This 90-day timeline should not be construed in any way to imply that you hold legal status in the U.S. or can otherwise remain in the U.S."

35.     This offer exploited Mr. Meka's H-1B status, assuming he couldn't afford litigation, and reflected an intentional delay to avoid costs by waiting for him to leave the country. The offer also failed to address Defendants' wage liability under H-1B regulations, which continued to accrue due to the lack of a bona fide termination.

36.     Despite Mr. Meka's good faith demand letters on March 21, 2025, April 4, 2025, and April 11, 2025, and attempts to negotiate with Defendants seeking to resolve these issues, Defendants failed to adequately respond or provide a reasonable resolution.

37.     Due to Defendants' actions, including their procedural failures in the background check process, Mr. Meka has been forced to incur significant litigation costs to address these violations, adding to his financial burden. Furthermore, he has had to use credit card balance transfers and savings from India to cover housing and litigation expenses, including balance transfer fees, interest, and opportunity costs.

38.     Faced with these circumstances, Mr. Meka was left with no choice but to commence

this action.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Violation of H-1B Regulations)
### (20 C.F.R. § 655.731 and 8 C.F.R. § 214.2)

39.    Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

40.    Under Department of Labor regulations at 20 C.F.R. § 655.731, Defendants were obligated to pay the required wage to Mr. Meka upon his entry into employment. A foreign worker on an H-1B visa is considered to have "entered into employment" when they make themselves available for work or otherwise come under the control of the employer.

41.    By providing Mr. Meka with company property (badge, Dlaunch invitation and corporate credit card) and setting start dates, Defendants established an employment relationship that triggered wage payment obligations.

42.    Even if Defendants contend that Mr. Meka had not "entered into employment," regulations at 20 C.F.R. § 655.731(c)(6)(ii) required Defendants to begin paying wages no later than 30 days after Mr. Meka's admission to the United States pursuant to the H-1B petition, which would have been January 25, 2025.

43.    Additionally, 20 C.F.R. § 655.731(c)(7)(i) specifically states that "a decision by the employer" such as conducting a background investigation after the approval of the H-1B petition does not exempt the employer from wage payment obligations. Defendants' excessive background investigation, which pulled IRS transcripts for over 10 years (2014-2024)—far beyond the 3-5 year standard required for H-1B compliance—and flagged unspecified "edits" they never clarified, constituted an unreasonable delay tactic to avoid these wage obligations despite Mr. Meka's compliance and ultimate clearance by First Advantage on January 23, 2025.

44.    Defendants violated 8 C.F.R. § 214.2(h)(4)(iii)(E), which requires H-1B employers to immediately notify USCIS of any material changes in the terms and conditions of employment that may affect eligibility. Defendants failed to notify USCIS of the rescission, as required for a bona fide termination.

45.    Defendants violated 8 C.F.R. § 214.2(h)(4)(i)(B)(1), which requires H-1B employers to maintain the terms and conditions of employment as specified in the Labor Condition Application (LCA). By failing to pay wages from December 26, 2024, Defendants failed to maintain these required terms.

46.    Defendants further violated 8 C.F.R. § 214.2(h)(13)(i)(A), which governs the authorized period of stay for H-1B nonimmigrants, by placing Mr. Meka in a precarious immigration status without properly terminating the H-1B relationship in accordance with regulations.

47.    Defendants also violated 8 C.F.R. § 214.2(h)(15)(i), which concerns H-1B extensions and maintenance of status, by failing to provide the documentation necessary for Mr. Meka to transfer his visa to another employer.

48.    Deloitte LLP, as the parent company that controls and directs the operations of Deloitte Consulting LLP, including employment and immigration-related decisions, is jointly liable with Deloitte Consulting LLP for these H-1B violations.

49.    These violations prevented Mr. Meka from transferring his H-1B visa, causing professional harm and financial hardship, and significantly damaging his reputation by hindering his ability to secure lawful employment.

50.    Therefore, Plaintiff seeks: a. Back pay from December 26, 2024, to the date of H-1B withdrawal in March 2025 at $160,000 per year plus interest; b. The promised $5,000 signing

bonus; c. An order directing Defendants to provide all necessary employment documentation required for immigration purposes, including paystubs and employment verification for the period of employment obligation; d. Reimbursement for all H-1B transfer fees and related immigration expenses incurred as a direct result of Defendants' improper handling of Mr. Meka's employment and immigration status; and e. Attorney's fees and costs.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Willful Misconduct Related to H-1B Violations)

51.     Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

52.     Defendants' offer of only a return ticket home, without paying wages, and their delay tactics of approximately 48 days before making this offer, reflect willful misconduct by exploiting Mr. Meka's H-1B status.

53.     Defendants assumed Mr. Meka couldn't afford litigation and intentionally delayed compliance in an attempt to avoid their obligations under H-1B regulations, hoping he would leave the country without pursuing his legal rights.

54.     These actions constitute willful misconduct and bad faith in Defendants' handling of their H-1B obligations, causing substantial harm to Mr. Meka's immigration status, professional opportunities, and financial situation.

55.     Plaintiff seeks punitive damages of at least $320,000 to deter similar exploitative conduct; a declaration that Defendants' conduct was willful and in bad faith; enhanced liquidated damages due to the willful nature of the violations; and attorney's fees and costs.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Employment Contract)

56.    Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

57.    Defendants and Mr. Meka entered into a valid employment contract on August 21, 2024, when Mr. Meka accepted Deloitte Consulting's offer of employment as a Senior Consultant with an annual salary of $160,000 plus a $5,000 signing bonus. This offer letter was issued with the authority and approval of both Deloitte LLP and Deloitte Consulting LLP.

58.    Defendants' offer letter constituted a binding contract once accepted by Mr. Meka, who fulfilled all pre-conditions by providing required documentation, completing background check requirements, and making himself available for work upon entry to the United States under Deloitte Consulting's H-1B sponsorship.

59.    Defendants wrongfully rescinded Mr. Meka's offer based on baseless claims, including alleged failure to provide prior employer verification and non-disclosure of the completed part-time role, despite his demonstrated compliance and the successful completion of his background check on January 23, 2025.

60.    Defendants' rescission on January 30, 2025, breached this contract, as Mr. Meka had satisfied all conditions precedent to employment, and Defendants' cited reasons for rescission were pretextual and not supported by the facts or their own policies.

61.    As a direct result of this breach, Mr. Meka has suffered damages including lost wages and benefits, relocation costs, immigration complications, professional reputation damage, and emotional distress.

62.    Plaintiff seeks specific performance through reinstatement as Senior Consultant with all promised benefits; compensatory damages for lost wages from breach to reinstatement;

consequential damages for relocation expenses, housing costs, and living expenses incurred in reliance on the contract; and pre-judgment and post-judgment interest.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Violation of the Fair Credit Reporting Act)
### (15 U.S.C. § 1681 et seq)

63.     Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

64.     Defendants are "users of consumer reports" and subject to the requirements of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.

65.     Defendants obtained and used consumer reports (background checks) about Mr. Meka for employment purposes, triggering FCRA obligations.

66.     Despite stating their policy of complying with federal and state laws, including FCRA regulations, for background checks [Offer Letter, Page 3], Defendants failed to provide Mr. Meka with a copy of his consumer report and a written description of his rights under the FCRA before taking adverse action based on the report.

67.     Defendants failed to provide Mr. Meka a reasonable opportunity to dispute alleged inaccuracies in his background check before rescinding his offer, violating 15 U.S.C. § 1681b(b)(3). This violation was particularly egregious given that Defendants conducted an excessive investigation pulling IRS transcripts for over 10 years (2014-2024), far beyond the 3-5 year standard required by USCIS regulations (8 C.F.R. § 214.2) for H-1B verification, and flagged unspecified "edits" they never clarified despite Mr. Meka's prompt disclosure on January 19, 2025, and his subsequent clearance by First Advantage on January 23, 2025.

68.     Defendants failed to provide proper notice of their intent to take adverse action based on information in a consumer report, as required by 15 U.S.C. § 1681m.

69.     Defendants' violations of the FCRA were willful and/or negligent, entitling Mr. Meka to statutory damages, actual damages, punitive damages, costs, and attorney's fees under 15 U.S.C. §§ 1681n and 1681o.

70.     Plaintiff seeks statutory damages of $1,000 per willful FCRA violation; actual damages for lost wages and professional reputation harm; punitive damages for willful noncompliance; attorney's fees and costs under 15 U.S.C. §§ 1681n and 1681o; and an order requiring Defendants to implement proper FCRA compliance procedures.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Promissory Estoppel)**

71.     Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

72.     Defendants made clear and unambiguous promises to Mr. Meka, including promises of employment as a Senior Consultant with a $160,000 annual salary, a $5,000 signing bonus, benefits, and H-1B visa sponsorship.

73.     Mr. Meka reasonably and foreseeably relied on these promises when he:

(a) Relocated from India to the United States in December 2024;

(b) Incurred significant expenses for travel, housing, and living costs;

(c) Rejected other employment opportunities in both India and the United States;

(d) Entered the U.S. under Deloitte Consulting's H-1B sponsorship on December 26, 2024; and

(e) Faced significant stress and uncertainty regarding his immigration status.

74.     Defendants should have reasonably expected that these promises would induce such reliance.

75.    Mr. Meka's reliance on these promises resulted in substantial detriment, including financial losses, immigration complications, gap in employment history, and professional reputation damage.

76.    Injustice can only be avoided by enforcing Defendants' promises through reinstatement and compensation for the resulting damages.

77.    Plaintiff seeks enforcement of Defendants' promises through reinstatement; reliance damages for travel costs from India to the United States, housing expenses, and other costs incurred in reliance on Defendants' promises; damages for lost alternative employment opportunities; and compensation for immigration complications.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress)**

78.    Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

79.    Defendants' conduct toward Mr. Meka was extreme and outrageous, going beyond all possible bounds of decency and regarded as atrocious and utterly intolerable in a civilized community.

80.    Such conduct included: a. Sponsoring Mr. Meka's H-1B visa, inducing him to enter the United States, and then abruptly rescinding his offer based on pretextual reasons; b. Failing to provide proper termination documentation, leaving him in immigration limbo; c. Exploiting his vulnerable immigration status by offering only return transportation without addressing wage obligations; d. Creating a situation where he was unable to obtain alternative employment due to lack of required documentation; and e. Forcing him to expend significant resources on litigation to protect his immigration status and professional reputation.

81.    Defendants acted with reckless disregard of the high probability that their conduct would cause severe emotional distress to Mr. Meka.

82.    As a direct result of Defendants' extreme and outrageous conduct, Mr. Meka has suffered severe emotional distress, including anxiety, stress, humiliation, and damage to his professional reputation.

83.    No reasonable person could be expected to endure the emotional distress caused by Defendants' actions.

84.    Plaintiff seeks compensatory damages for severe emotional distress, anxiety, and humiliation; damages for psychological counseling and treatment; punitive damages of at least $500,000 to deter similar conduct; and any other relief the Court deems appropriate to address the emotional harm inflicted.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Fraud and Misrepresentation)

85.    Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

86.    Defendants made numerous material misrepresentations and omissions to Mr. Meka regarding his employment prospects, including but not limited to: a. False representations that his background check had been satisfactorily completed prior to H-1B sponsorship; b. False representations regarding his employment security and start date following his entry to the United States; c. Concealment of their intention to conduct an additional, more stringent background check after his entry into the United States; d. False representations regarding the requirements for disclosure of past employment, particularly part-time roles; and e. Concealment of their predetermined intention to rescind his employment offer regardless of his compliance with their

requests.

87.    Defendants knew these representations were false when made, or made them with reckless disregard for their truth, as evidenced by: a. Their sponsorship of Mr. Meka's H-1B visa after completing the initial background check, indicating the check had been satisfactorily completed; b. Their continued communications regarding onboarding activities, company equipment, and start dates while simultaneously planning to rescind his offer; c. Their possession of all material information about Mr. Meka's employment history prior to sponsoring his H-1B visa, as confirmed by multiple email communications and notes in his file; and d. Their later use of system constraints in their own background check process as a pretext for rescission, despite having full knowledge of these constraints.

88.    Even if Defendants did not knowingly make false representations, they owed Mr. Meka a duty of care as his prospective employer and visa sponsor to: a. Exercise reasonable diligence in verifying his employment history before sponsoring his visa; b. Accurately communicate the status of his background check and employment prospects; and c. Disclose material information that would affect his decision to enter the United States under their sponsorship.

89.    Defendants breached this duty by negligently misrepresenting the status of his background check and employment prospects, and by failing to disclose material information regarding their intended actions.

90.    Defendants intended for Mr. Meka to rely on these misrepresentations and omissions in accepting their offer, rejecting other employment opportunities, relocating to the United States, and entering under their H-1B sponsorship.

91.    Mr. Meka justifiably relied on these misrepresentations and omissions to his

detriment, suffering substantial damages including: a. Significant relocation costs and living expenses; b. Loss of alternative employment opportunities both in India and the United States; c. Immigration complications and uncertainty regarding his legal status; and d. Professional reputation damage impacting future employment prospects.

92.    But for Defendants' fraudulent and negligent misrepresentations, Mr. Meka would not have relocated to the United States, incurred significant expenses, or found himself in the precarious immigration position he now faces.

93.    Given the special relationship created by Defendants' role as Mr. Meka's visa sponsor, and his particular vulnerability as an H-1B visa holder dependent on their sponsorship, Defendants had fiduciary obligations to act with utmost good faith and to make full and fair disclosure of all material facts.

94.    Plaintiff seeks compensatory damages of not less than $100,000 for all losses caused by Defendants' fraudulent and negligent misrepresentations; punitive damages of not less than $200,000 for the willful and malicious nature of Defendants' fraud; special damages for costs associated with relocating to the United States in reliance on these misrepresentations; and prejudgment interest, attorney's fees, and costs.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

95.    Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

96.    Under New York law, every contract contains an implied covenant of good faith and fair dealing, which obligates each party to refrain from acts that would prevent the other party from receiving the benefits of their agreement. This covenant protects a party's reasonable

expectations under the contract.

97.    Defendants breached this implied covenant by: (a) conducting a second background check after Mr. Meka's entry into the United States under their H-1B sponsorship despite having previously completed a satisfactory background check; (b) implementing an excessive investigation that pulled IRS transcripts for over 10 years (2014-2024)—far beyond the 3-5 year standard required by USCIS regulations—and flagging unspecified "edits" they never clarified; (c) using information they already possessed or should have discovered during the initial background check as a pretext for rescission; (d) rescinding Mr. Meka's employment offer after inducing him to relocate internationally under their visa sponsorship; (e) failing to provide proper documentation following the rescission to enable Mr. Meka to mitigate his damages by seeking alternative employment; and (f) deliberately exploiting Mr. Meka's vulnerable immigration status to evade their legal and contractual obligations.

98.    These actions were undertaken in bad faith and with the purpose of depriving Mr. Meka of the rightful benefits of his employment agreement, including wages, benefits, professional development, and lawful immigration status.

99.    As a direct and proximate result of these breaches, Mr. Meka has suffered significant damages, including lost wages and benefits, immigration complications, professional reputation damage, and emotional distress.

100.    Plaintiff seeks compensatory damages in an amount not less than $100,000 for all losses resulting from Defendants' breach of the implied covenant, including consequential damages for loss of professional opportunities, and attorney's fees and costs as permitted by law.

**AS AND FOR A NINTH CAUSE OF ACTION**
**(Violation of New York Labor Law)**

101.    Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

102.    Defendants are "employers" within the meaning of the New York Labor Law ("NYLL") § 190(3), and Mr. Meka is an "employee" within the meaning of NYLL § 190(2).

103.    Pursuant to NYLL § 191, employers must pay wages in accordance with the agreed-upon terms of employment. Under NYLL § 195, employers must provide proper wage notices and statements to employees.

104.    Defendants violated NYLL § 191 by failing to pay Mr. Meka his agreed-upon wages of $160,000 per year and his promised $5,000 signing bonus, despite his entry into the United States under their H-1B sponsorship and his availability for work beginning December 26, 2024.

105.    Defendants violated NYLL § 195 by failing to provide Mr. Meka with proper wage notices and statements following his entry into the United States under their H-1B sponsorship.

106.    Defendants' violations of the NYLL were willful, as evidenced by their systematic exploitation of Mr. Meka's immigration status and their deliberate efforts to evade their legal obligations.

107.    As a result of these violations, Mr. Meka is entitled to recover unpaid wages, liquidated damages, statutory penalties, interest, and attorney's fees and costs pursuant to NYLL §§ 198 and 663.

108.    Plaintiff seeks recovery of all unpaid wages from December 26, 2024; liquidated damages equal to 100% of the unpaid wages pursuant to NYLL § 198(1-a); statutory penalties for violations of NYLL § 195 in the amount of $5,000; prejudgment interest at the statutory rate; and reasonable attorney's fees and costs.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Negligent Hiring and Supervision)

109.    Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

110.    Defendants had a duty to hire, train, and supervise employees who were competent to handle sensitive immigration and background check matters, particularly given their regular employment of H-1B visa holders and their status as major federal contractors subject to H-1B regulations.

111.    Defendants breached this duty by: (a) implementing a fundamentally flawed background check system that forced applicants to provide inaccurate information, as evidenced by the BIQ system's rejection of accurate employment gap information; (b) failing to properly train personnel to recognize and appropriately address the limitations of their background check system; (c) failing to ensure proper communication between departments handling immigration matters and those conducting background checks; and (d) failing to implement policies to protect H-1B visa holders from pretextual terminations after their entry into the United States.

112.    Defendants knew or should have known that their negligent hiring and supervision practices created an unreasonable risk of harm to employees, particularly vulnerable H-1B visa holders like Mr. Meka.

113.    As a direct and proximate result of Defendants' negligence, Mr. Meka has suffered substantial damages, including immigration complications, professional reputation damage, and financial losses.

114.    Plaintiff seeks compensatory damages in an amount not less than $75,000 for all losses resulting from Defendants' negligent hiring and supervision; damages for the cost of

reestablishing professional credentials and reputation; and consequential damages for all reasonable foreseeable losses.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
**(Unjust Enrichment)**

115.    Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

116.    Defendants received a benefit at Mr. Meka's expense by: (a) sponsoring his H-1B visa, potentially fulfilling diversity hiring initiatives or federal contractor obligations; (b) maintaining him as a prospective employee to be deployed on client projects while avoiding payment of wages; and (c) using his specialized skills and experience in marketing materials and representations to clients and government entities.

117.    Defendants' retention of these benefits without providing Mr. Meka with the promised compensation and employment is unjust and inequitable.

118.    Equity and good conscience require restitution under these circumstances, as Defendants exploited Mr. Meka's vulnerable immigration status for their organizational benefit while deliberately evading their legal and ethical obligations.

119.    Plaintiff seeks restitution in the amount not less than $50,000 for the value of the benefits conferred upon Defendants; disgorgement of any profits earned by Defendants through their unjust actions; prejudgment interest; and attorney's fees and costs.

### AS AND FOR A TWELFTH CAUSE OF ACTION
**(Violation of New York State Human Rights Law)**

120.    Plaintiff restates and realleges all of the allegations contained in the prior paragraphs as though fully set forth herein.

121.    The New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 296, prohibits discrimination in employment based on national origin, alienage, or citizenship status.

122.    Defendants engaged in a pattern of discriminatory treatment toward Mr. Meka based specifically on his status as a non-citizen and H-1B visa holder. This discriminatory treatment was manifested through:

(a) Imposing a heightened and differential background check standard on Mr. Meka that was not applied to U.S. citizen employees, including conducting a second background check after his H-1B entry despite having completed a satisfactory check prior to visa sponsorship;

(b) Exploiting technical limitations in Defendants' own background check system to penalize Mr. Meka for allegedly misrepresenting his employment status, when in fact the system constraints forced this representation and Defendants had been explicitly informed of his actual employment situation;

(c) Refusing to provide the legally required documentation upon rescission of his offer, documentation that would have been routinely provided to U.S. citizen employees and that was critical for his immigration status;

(d) Using his vulnerable immigration status as leverage to avoid compliance with federal and state labor regulations, including offering only return transportation to India instead of fulfilling the wage obligations required by law;

(e) Applying a different and more stringent standard regarding disclosure of prior employment, particularly for his completed part-time role, than would be applied to U.S. citizen employees; and

(f) Engaging in dilatory tactics over a period of approximately 48 days before

responding to his complaint, tactics designed to pressure him to leave the country without pursuing his legal rights.

123.    Defendants' discriminatory intent is evidenced by internal communications and actions that demonstrate their awareness of Mr. Meka's particular vulnerability as an H-1B visa holder and their calculated decision to exploit this vulnerability: a. Mr. Whittle's confirmation that he had noted Mr. Meka's IBM end date in his interview notes, showing Defendants had this information but chose to later use it against him; b. Defendants' offer of only return transportation home with the explicit statement that "This 90-day timeline should not be construed in any way to imply that you hold legal status in the U.S. or can otherwise remain in the U.S.," demonstrating their attempt to intimidate him regarding his immigration status; and c. The systematic difference in treatment compared to U.S. citizen employees who would not face similar obstacles when attempting to pursue remedies for wrongful termination.

124.    Statistical evidence supports the pattern of discriminatory treatment of non-citizen employees by Defendants. Upon information and belief, Defendants routinely: a. Target foreign workers for layoffs and rescissions during economic downturns or strategic restructuring, as they are less likely to pursue legal remedies due to visa dependencies; b. Apply heightened scrutiny to background checks for foreign workers compared to U.S. citizens, particularly in post-entry verification processes; and c. Fail to provide proper documentation and severance to terminated H-1B employees at a statistically significant higher rate than U.S. citizen employees.

125.    Defendants' discriminatory practices violate both the letter and spirit of the NYSHRL, which was specifically designed to protect non-citizens from such exploitation based on their vulnerable immigration status.

126.    As a direct result of this discrimination, Mr. Meka has suffered significant damages,

including loss of wages and benefits, damage to his professional reputation, immigration complications, emotional distress, and the costs associated with pursuing legal remedies while maintaining his presence in the United States.

127.    Plaintiff seeks back pay in an amount not less than $53,330; compensatory damages for emotional distress in an amount not less than $100,000; punitive damages in an amount not less than $200,000 to deter similar discriminatory practices; and attorney's fees and costs as provided under N.Y. Executive Law § 297(10).

**WHEREFORE,** Plaintiff demands final judgment against Defendant as follows:

(a) on the First and Second Causes of Action for H-1B Violations, awarding Plaintiff back pay from December 26, 2024, to the date of H-1B withdrawal in March 2025 at the rate of $160,000 per year (prorated for the applicable period), ordering payment of the promised $5,000 signing bonus, ordering Defendants to provide all necessary employment documentation required for immigration purposes, including paystubs and employment verification, ordering reimbursement for all H-1B transfer fees and related immigration expenses incurred due to Defendants' improper handling of Plaintiff's immigration status, and awarding punitive damages of not less than $320,000 for willful misconduct;

(b) on the Third Cause of Action for Breach of Employment Contract, ordering Defendants to reinstate Plaintiff to his position as Senior Consultant with all benefits and seniority, or alternatively, awarding compensatory damages for lost wages and benefits of not less than $53,330;

(c) on the Fourth Cause of Action for FCRA Violations, awarding statutory damages of $1,000 per willful violation, actual damages of not less than $50,000 for harm to

professional reputation and employment prospects, and punitive damages of not less than $100,000;

(d) on the Fifth Cause of Action for Promissory Estoppel, ordering specific performance through reinstatement to the promised position and awarding compensatory damages for reliance costs including international relocation expenses, visa-related expenses, and housing costs of not less than $25,000;

(e) on the Sixth Cause of Action for Intentional Infliction of Emotional Distress, awarding compensatory damages of not less than $100,000 and punitive damages of not less than $500,000;

(f) on the Seventh Cause of Action for Fraud and Misrepresentation, awarding compensatory damages of not less than $100,000, punitive damages of not less than $200,000, and special damages for costs associated with relocating to the United States;

(g) on the Eighth Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing, awarding compensatory damages of not less than $100,000;

(h) on the Ninth Cause of Action for Violation of New York Labor Law, awarding unpaid wages, liquidated damages equal to 100% of unpaid wages, statutory penalties of $5,000, and prejudgment interest at the statutory rate;

(i) on the Tenth Cause of Action for Negligent Hiring and Supervision, awarding compensatory damages of not less than $75,000;

(j) on the Eleventh Cause of Action for Unjust Enrichment, awarding restitution of not less than $50,000;

(k) on the Twelfth Cause of Action for Violation of New York State Human Rights Law, awarding back pay of not less than $53,330, compensatory damages of not less than

$100,000, and punitive damages of not less than $200,000

(l) on all causes of action, awarding Plaintiff reasonable attorney's fees, litigation costs of not less than $50,000, and pre-judgment and post-judgment interest as permitted by law;

(m) awarding liquidated damages for reputational harm, personal harm due to lack of health insurance, financial hardship, and associated losses, in an amount to be calculated by the Court but not less than $100,000; and

(n) granting such other and further relief as the Court deems just and proper.


DATED:        April 29, 2025
              New York, NY

                                    Respectfully Submitted,

                                    **Paykin Law**
                                    *Attorneys for Plaintiff*

                                    _____
                                    By: Mingyuan Zhang, Esq.
                                    45 Rockefeller Plaza, 20th Fl,
                                    New York, NY 10111
                                    Phone: 212-858-9112 x. 817
                                    Fax: 212-858-9177 (Not for service)
                                    sunny@paykinlaw.net

<u>**VERIFICATION**</u>

STATE OF NEW YORK    )
                         )ss.:
COUNTY OF NEW YORK  )

      Mingyuan Zhang, an attorney admitted to practice in the Courts of the State of New York, affirms that the following statements are true under penalties of perjury:

      Deponent is the attorney of record for Anudeep Meka, the Plaintiff in the within action. Deponent has read the foregoing Verified Complaint, knows the contents thereof, and that the same is true to Deponent's own knowledge, based on documentary evidence, conversations with Deponent's client and first-hand research, except as to the matters therein stated to be alleged upon information and belief, and as to those matters deponent believes them to be true.

      This verification is made by Deponent and not by Plaintiff because Plaintiff does not reside or maintain an office in any county wherein Deponent maintains an office.

      The grounds of Deponent's belief as to all matters not stated upon Deponent's knowledge are as follows: Statements of and conversations with my client, client's records, and Deponent's general investigation into the facts of this case.

DATED:      April 29, 2025
             New York, NY

                              Respectfully Submitted,

                              **Paykin Law**
                              *Attorneys for Plaintiff*

                              By: Mingyuan Zhang, Esq.
                              45 Rockefeller Plaza, 20th Fl,
                              New York, NY 10111
                              Phone: 212-858-9112 x. 817
                              Fax: 212-858-9177 (Not for service)
                              sunny@paykinlaw.net